## RAIL & RIVER COAL CO. et al. v. PAISLEY.

(Circuit Court of Appeals, Third Circuit. June 15, 1916.)

No. 2074.

EVIDENCE ⟨⟩441(6)—DOCUMENTARY EVIDENCE—PAROL EVIDENCE TO VARY.

Plaintiff, a real estate broker, attempted to secure a purchaser for defendants' coal lands. By two letters of April 26th, the defendants placed a price on the lands and also offered to pay plaintiff a commission of 10 per cent. The letter placing a price on the land recited that it was subject to withdrawal in 10 days. Thereafter, by subsequent letter, defendants gave plaintiff an option on the lands and also by separate letter agreed to pay a stated commission. *Held,* that the two instruments must be taken together as constituting a single contract for payment of a commission on sale of the land at an agreed price, and so parol evidence is not admissible to show that there was an agreement to pay a commission in the event that the purchaser interested by plaintiff should acquire the land.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1766–1771, 2041; Dec. Dig. ⟨⟩441(6).]

In Error to the District Court of the United States, for the Western District of Pennsylvania; W. H. Seward Thomson, Judge.

Action by J. A. Paisley against the Rail & River Coal Company and others. There was a judgment for plaintiff, and defendants bring error. Reversed and remanded.

Patterson, Crawford, Miller & Arensberg, of Pittsburgh, Pa. (Thomas Patterson, of Pittsburgh, Pa., John G. Johnson, of Philadelphia, Pa., and Joseph Stadtfeld, of Pittsburgh, Pa., of counsel), for plaintiffs in error.

John McCartney Kennedy, H. F. Stambaugh, and Watson & Freeman, all of Pittsburgh, Pa., for defendant in error.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

McPHERSON, Circuit Judge. This action between citizens of different states is brought to recover commissions on a sale of the capital stock, carrying with it the property, of the Rail & River Coal Company. The purchaser was the Grand Trunk Pacific Development Company, a Canadian corporation, and the facts leading up to the sale, and giving rise to the dispute, are in outline as follows:

In the spring of 1910, the plaintiff, J. A. Paisley, a dealer of some prominence in bituminous coal, residing in Cleveland, made an effort to bring about a sale of the coal company's property to the Grand Trunk Railway Interests. For several years he had had business relations with Chas. M. Hays, the president of the Railway, and was also acquainted with one or two of the stockholders in the Coal Company. These stockholders (all residents of Pittsburgh) were Isaac W. Frank, W. R. Woodford, W. L. Kann, and the estate of Jacob Kaufmann. They owned all the capital stock, and in order to protect and advance their common interests they had also formed a partnership or association known as the Rail & River Coal Company Syndicate. The com-

pany owned 300 acres of surface and 32,000 acres of coal in Belmont county, Ohio. Three mines had been opened, $250,000 of improvements had been put on the property, and a going business had been built up. As already stated, Paisley had done business with the Railway Company and was familiar with its fuel requirements. Knowing that Hays had been considering the advisability of acquiring a source of coal supply, and knowing also that the Coal Company was willing to sell, he brought the company's property to the attention of Hays on April 15, and three days later received a reply, in which Hays stated, that he should—

"be glad to look into the property you speak of, if you will give me, in confidence, the price at which it can be obtained, and also advise me whether an option could be had at the price quoted for say six months, in order to enable me to thoroughly investigate as (to) the property and its value. * * * I should not want the parties to know we were considering the matter, or that it had any interest to us, until we were protected by a firm option for a period of time as before stated, which would enable us to look into it."

On April 26 Paisley saw Frank in Pittsburgh and asked if the property was for sale, saying that he had a purchaser for it. Frank answered in the affirmative, and quoted a price of $100 per acre for the coal and $250,000 for the surface and the improvements. As a result of the conference Frank handed the following letters to Paisley on the same day:

"Rail & River Coal Company,
"W. R. Woodford, President.

"Pittsburgh, Pa., April 26, 1910.

"Mr. J. A. Paisley, Cleveland, Ohio—Dear sir: Confirming verbal statement to you, with reference to the Rail & River Coal Company property in [Belmont] county, Ohio, beg to say that we own about 32,000 acres unmined coal, about 300 acres surface land in connection therewith, and also improvements valued at $250,000. We will sell this property at $100 per acre of coal, including the surface land, and $250,000 for the improvements.

"The property now carries $2,050,000 in bonds, five per cent., having twenty-seven years to run. I am warranted in saying that this bond issue could be carried as part payment for the property.

"The railroads skirting this property are the B. & O. road on the east, the Penna. Company on the south, and the Bellaire, Zanesville & Cincinnati running through the center of the property, with the Wabash System about two and one-half miles distant. No. 1 and No. 2 mines are open on the Penna. R. R. and the river, with thirteen feet slack water, and the third mine, No. 6, is on the B. & O. R. R.

"The present conservative output of these three mines is three thousand tons per day.

"The above price is subject to recall within ten days.

"Very truly,                              Rail & River Coal Company,
                                            "Isaac W. Frank, Treasurer."

"Rail & River Coal Company,
"W. R. Woodford, President.

"Pittsburgh, Pa., April 26, 1910.

"Mr. J. A. Paisley, Cleveland, Ohio—Dear sir: Referring to price given you to-day on the Rail & River Coal Company property, if sold at said price I will personally arrange that you will receive a commission of ten per cent. (10%) of the same.

"Very truly,                                    Isaac W. Frank.'

One of these letters is evidently an official act on behalf of the Coal Company, while the other is an individual promise by Frank himself. Paisley understood this to be what it plainly is, a "ten-day option," and immediately went to Montreal and conferred with Hays about it, but of course nothing final could be done in so short a time. Accordingly Hays instructed Paisley to obtain an option for six months or a year, if possible, so as to allow time for a thorough examination. Upon Paisley's return to Cleveland, he received the following letter from the Coal Company under date of May 2:

"Referring to the option given you April 26th, expiring 10 days thereafter, beg to say that said option is hereby recalled, to take effect ten days after April 26th, which will be May 6th.

"Our company is entirely willing to sell our property at the price named to you in said option, but are not willing to give an option at this time, not knowing who your principals are in the matter. If you can work this sale up to a point where you feel justified in disclosing to us who your principals are in this matter, and we are satisfied that they are responsible, we would consider giving an option for thirty days in which to close the sale.

"Rail & River Coal Company,<br>"Isaac Frank, Treasurer."

On May 4 Paisley went to Pittsburgh and had an interview with Frank and Woodford. What took place is in some dispute, but there is no controversy about the fact that the interview resulted in the subsequent preparation of two papers, each bearing the date of May 5. One was in substance as follows:

It is a formal instrument called "Articles of Agreement" between the Coal Company, the Syndicate, and J. A. Paisley, and declares in detail that the Coal Company and the Syndicate give to Paisley—

" * * * the exclusive right or option to purchase at any time within 60 days from the date hereof, all the coal and surface lands and mining improvements, or the capital stock, of the Rail & River Coal Company * * * for the consideration or sum of one hundred dollars per acre of unmined coal, and $250,-000 for the mining improvements and surface land, payable with $2,050,000 in first mortgage bonds now on the property, and the balance in money, one-fourth on acceptance of this option, and one-fourth every four months thereafter, with six per cent. interest on the deferred payments."

If the stock should be taken, instead of the lands and improvements, it is to be "free from all debts excepting $2,050,000 bonds outstanding," and the price of the stock is to be—

" * * * for an equity over and above the $2,050,000 bonds figured as for the sale of the property as above, and all the accounts and bills receivable: Provided, the said party of the second part [Paisley], his heirs and assigns, shall within 60 days from the date hereof, notify the parties of the first part, their heirs or assigns, that he will take, accept, and purchase said coal lands and improvements, or stock, at the price and terms aforesaid."

Then follow a declaration that "time is the essence of this option," and a provision that, if Paisley does not notify the other parties of his election—

"to take, accept, and purchase said coal lands and improvements at the price and terms aforesaid at or before the expiration of 60 days from the date hereof, then this agreement shall forthwith become null and void and of no effect."

This agreement is formally signed by the Coal Company, the Syndicate, and Paisley.

Under the same date the Syndicate wrote Paisley a letter, saying:

"Referring to the option given you this day on the property of the Rail & River Coal Company, beg to say that if you sell this property at the price and on the terms named, we will give you 10 per cent. as a commission on the sale in kind—that is, 10 per cent. of the bonds received, and 10 per cent. of the cash received in the transaction, as and when said cash is delivered to us, we putting the bonds in trustee's hands for you, to be delivered when all the payments are made in cash.

"The Rail & River Coal Company Syndicate,
"Isaac W. Frank, Trustee."

At this point the dispute between the parties emerges. The defendants contend that the contract between the parties is to be found in the writings, and cannot be modified by parol, while Paisley's position is this:

When he came to Pittsburgh on April 26 (to quote from his statement of claim)—

"* * * it was then and there agreed between the said plaintiff and the said Isaac W. Frank, representing himself and also the other defendants, that in case the plaintiff secured a customer who was willing to purchase said coal properties, which could be conveyed either direct or by a transfer of the capital stock of the said Rail & River Coal Company, at a rate based upon the price of $100 per acre for the coal lands, with the surface lands thrown in, and $250,000 for the improvements, that the said Rail & River Coal Company and the said Rail & River Coal Company Syndicate, either or both, would pay to the plaintiff, as compensation for his services in connection with securing said customer and making said sale, the sum of ten per centum (10%) on the total purchase price received by defendants, or either of them for said properties.

"That in confirmation of this agreement the plaintiff received from the Rail & River Coal Company its letters of April 26, 1910, a true copy of which is hereto attached and marked Exhibit B, and also letter of April 26, 1910, a true copy of which is hereto attached and marked Exhibit C."

After receiving the letter of May 2 (again quoting from the statement of claim)—

"* * * the plaintiff had an interview with the defendants Woodford and Frank, representing all of the defendants, at which time, at defendants' special request, the plaintiff informed them that his customer for said coal property was Charles M. Hays, Esq., representing the Grand Trunk interests, and it was then and there expressly agreed that defendants would do everything in their power to aid in making a sale of the said coal property, and that if any sale of said coal property, either by deed, conveyance, or by transfer of the capital stock of said Coal Company, was made by the said defendants to the said Charles M. Hays, or the Grand Trunk interests represented by him, at the price or substantially the price in said letter, Exhibit B, or upon terms acceptable to the said defendants, that the said defendants would pay to the plaintiff the commission of ten per centum (10%) as before agreed upon."

He testified that on May 4 he saw Frank and Woodford (and perhaps Kann also) and insisted that, if he should disclose the name of his customer, the agreement must be that his commission should be paid if the customer took the property at the price named by the Coal Company or at any other price that might be accepted by the company as satisfactory. Frank and Woodford agreed to this, and he then showed them the letter from Hays of April 18, and told them that a year

or more might be necessary before the sale could be brought about. He was told to take all the time he wanted, but that the company would not tie up the property to one customer. He testified, further, that the written agreement of May 5 was not intended to be a complete agreement, but was only prepared to be shown to Hays; and that the agreement to pay the 10 per cent. was made at the first interview in April, was wholly in parol, and was not limited in time, the writing of May 5 on this subject being only intended to make clear that the Coal Company might be at liberty to pay a part of his commission in kind—that is, in bonds or other securities—and might not be liable to pay the whole amount in cash. The District Court submitted these questions to the jury, who found in favor of Paisley, and the rulings and the charge on this matter constitute the principal errors assigned. Before considering them, however, let us follow the transaction to the end.

Paisley's account of what took place was in some respects directly denied by the other parties, but of course, if his testimony as to the parol contract was admissible at all, and if the course of the trial was free from error, the verdict is beyond our power. After the papers were signed, Hays sent an engineer to examine the property. His report was ready about the time the option expired, but, in order to obtain a little longer grace, Paisley on July 2 asked for a ten days' extension, and this was granted by the Coal Company and the Syndicate in the following letter:

"Replying to your personal request, we reluctantly extend the option given you on the 5th day of May, 1910, expiring the 5th day of July, 1910, for the purchase of the property of the Rail & River Coal Company. It is hereby extended until and including July 16, 1910."

The engineer recommended that additional land should be acquired, that three new mines should be opened, and that 20 miles of railroad should be built; these improvements (estimated at $1,300,000) to be made by the Coal Company or the Syndicate. When the defendants learned of these recommendations, they rejected them at once and this was the end of that particular negotiation. Paisley continued to hope, however, that the subject might be taken up again, and that he might receive a new option; occasionally, perhaps once a month, he referred to the "deal" in subsequent business conversations with Hays, and he spoke of it also in two or three letters about other matters, but he was never authorized to make, and (so far as appears) he never did make, a third offer.

In the following November, the defendants themselves made an effort to sell to Hays, and gave an option to a Mr. Ramsey, agreeing to pay him 10 per cent. if he should succeed. We do not know the other terms of this option, but in any event it expired in December, and a second option, which was given to Ramsey in February, 1911, expired at the end of that month. During the pendency of the second option, Frank asked Ramsey to agree that Paisley should receive one-tenth of his own commission, saying that Paisley had "brought this matter to our attention first and gave us the name of his principal, which is also your principal." He added:

"We feel that Mr. Paisley should have some recognition for his services, and rely upon you, if necessary, to satisfy a reasonable demand by Mr. Paisley. Our idea is now that not over one-tenth of your commission would be necessary to entirely satisfy him. We trust you will see this is but fair, and wish you success in closing this matter."

And (as we understand) Ramsey assented. Nothing came of Ramsey's efforts. In February the railway board in London declined to agree to the purchase, and Hays so notified Ramsey on February 25. In March, 1911, after this second option had expired, Paisley learned of Ramsey's employment and protested to Frank that this had been a violation of his own rights, and had been intended to prevent him from earning a commission. Frank explained what had been done, and the evidence is conflicting whether Paisley was satisfied with the explanation. Late in April—Hays being about to visit London to confer with his masters, the Grand Trunk Railway directors in that city, on various subjects, including the purchase of a coal field (which he continued to favor)—Paisley wrote to Frank and Woodford, asking that his interest be protected, and saying that this was the agreement when he disclosed his principal. Frank replied on May 1, stating that he would carry out the understanding between Paisley, Woodford, and himself to the effect that, if the sale was made to the Grand Trunk Railway, he and Woodford would take care of Paisley's interests, and calling Paisley's attention to the fact that, when he had visited them in March, he had been advised of the arrangement that he should receive one-tenth of Ramsey's commission, and had agreed to this as entirely satisfactory, promising to "do what you [he] could to further the sale." Woodford confirmed Frank's letter a few days later, and Paisley replied to them both on May 12. In this reply he said he was "a little sore from the way this has been handled by yourself, Mr. Frank, and Mr. Ramsey, Jr., as the matter has considerable bearing with my Canadian friends and the Inland Navigation Company." He said further that he "had the deal going as fast as it could go," complained again about Ramsey's interference, and asserted that he himself was "absolutely the fellow that put the deal through, providing it goes." On June 12 Frank wrote to Paisley on behalf of the Syndicate, referring to Paisley's letter of May 12, and saying inter alia:

"I beg to call your attention to the fact that your option expired by limitation July 16, 1910. Any work or effort that you have made since that time has been entirely voluntary on your part, and unsolicited by us. We appreciate the interest you have taken in this matter, but it must be clearly understood that, should we consummate a sale to the Grand Trunk R. R., any compensation we should see fit to make to you will be entirely voluntary on our part."

To understand fully the situation at this time, it is desirable to go back a few months. Late in February, 1911, W. L. Kann, one of the defendants, had a talk with Hays and was assured that (owing to the attitude of the London board) no arrangement could be made under the terms of Ramsey's option. Thereupon, after referring to the previous negotiations by Paisley and by Ramsey, Kann brought forward a new aspect of the situation, and offered to take up the matter

afresh on a "tonnage basis." His fundamental thought, never before proposed and apparently original with him, was that the Grand Trunk Railway should agree to buy the coal for its system from the Coal Company, and that a mutually advantageous scheme should be built up on this foundation. Hays was willing to discuss the proposal further, and negotiations between Kann and Hays were begun and thereafter were actively carried on. When Hays went to London in May to consult his board on several matters, Kann went abroad also on this and other business, and had some conference there with Hays, although without favorable result. In spite of Hays' wishes, the Railway Board (the final authority on the subject) declined to sanction Kann's scheme, and in effect Hays had given it up before he came back to Canada. This was late in May or early in June, and, when Kann made another effort to go on with the negotiations here, Hays replied to him on June 21:

"I discussed the matter of the coal property further with Chairman Smithers after our last interview in London, but did not receive sufficient encouragement to make me feel like pressing the matter, and I therefore think it only fair to you to say that, so far as we are concerned, the negotiations may be considered as concluded. I thank you very much for your personal time and attention you have given the matter, and desire to say that my own views as to the desirability of obtaining a coal property of this character are unchanged; but, as I explained to you personally, I have too many other matters of greater importance to carry with our board to warrant me in prejudicing them by pressing my views on this particular subject."

Kann persisted, however, in pressing his "tonnage" project, and gradually advanced it to the point of acceptance after correspondence and interviews and a second examination of the property by another engineer sent by Hays. The plan was finally agreed upon early in December, although the details were not elaborated or the papers executed until April, 1912. In outline the proposal was this:

The Grand Trunk Railway was to agree to buy from the Coal Company at least 400,000 tons of coal each year for 10 years from April 1, 1912, which the Coal Company was to sell for 30 cents a ton more than the cost of production. This assured the Coal Company a large annual profit, and, as this could be used to pay interest on bonds, and take care of other corporate obligations, it was, of course, a material addition to the value of the capital stock. The stock was to be sold to the Grand Trunk Pacific Development Company, a subsidiary of the Grand Trunk Railway, for $350,000, payable in notes of the Development Company that would fall due at intervals during a period of nine or 10 years. The Coal Company was also to issue $1,500,000 of second mortgage bonds (whose interest was provided for by the profit to be derived from the railway's contract), and the bonds were to be taken by the Development Company at 70, the price ($1,050,000) to be included in the notes of the Development Company just referred to. The Coal Company was to dispose of the notes, and to use the proceeds, inter alia, to pay certain of the company's debts. To give the notes value, they were to be secured by a collateral trust, pledging the Coal Company's stock and the second mortgage bonds. This ingenious plan was carried out, the contract to buy the coal was authorized and made, the second mortgage bonds were issued, the bonds

and the Coal Company's stock were transferred to the Development Company and were duly pledged, and the notes were issued and immediately sold at 97. This closed the transaction; the Development Company becoming the owner of the Coal Company's stock, and the property being still incumbered by the first mortgage. The proceeds from the notes paid off certain debts of the Coal Company and a net balance of $836,048.42 went to the Syndicate.

[1] We have omitted many details, but the foregoing statement outlines the transaction sufficiently to make it evident that the decision of the dispute turns on the extent to which the parol evidence rule should be applied. If the papers are to measure Paisley's rights, it is clear that much of the evidence was inadmissible; but, if his rights depend upon a parol contract, much of the evidence was no doubt properly received, in order to prove the existence and the terms of such a contract. The vital question, therefore, is whether the writings permit him to assert that the agreement to pay a commission was in parol, separate from the writings, and inconsistent with their terms. He asserts that such an agreement was made on April 26. This is the distinct language of his pleading, and he repeated the assertion on the stand. If this be true, we think he encounters a serious difficulty at the beginning. On that day he saw no one except Frank, the written contract concerning commissions was made with Frank, and this contract expressly binds Frank as an individual. In our opinion the two letters of that date are plainly parts of one instrument, and are to be read together, although for obvious reasons they were physically separate. Paisley's commission was a private affair and did not concern the purchaser, but we think there is no fair room for doubt that the two writings were parts of a single whole. The present suit, however, is a joint action against the Coal Company and against three of the individuals composing the Syndicate, and in strictness cannot succeed unless by the aid of proof that all the defendants were bound by the contract sued upon. In face of a writing that binds Frank alone, we have some trouble in understanding on what ground the plaintiff should be allowed to set up a parol agreement on the same subject binding Frank jointly with several other defendants. Nevertheless the jury were instructed that, if they found as a fact that—

" * * * the agreements were separate and distinct, and were intended so to be by the parties, that the contract of employment was a verbal one, and that the written memorandum as to the commissions was, and was intended to be, only a part of the general contract of employment, and that there was no time limit thereon, then the contract would be binding upon the parties, if the plaintiff performed his part of the agreement as to the sale, unless the agreement was afterwards annulled by the parties or another agreement substituted therefor."

In this submission we think there was error.

This was the vital question raised by the plaintiff's statement of claim, but the case seems to have been tried on the merits in a liberal way, and in this respect we follow the parties and the District Court. The transaction of May 4–5 came next to be considered, and here we think a similar error was committed. In our opinion the two writ-

ings of May 5 are even more plainly to be taken and read together as parts of one agreement, and we therefore hold that the court should not have instructed the jury that:

"Here again you must determine under the evidence what the contract was between the parties on May 5, 1910."

And in the same connection it was erroneous to instruct the jury as follows:

"On the other hand, the plaintiff contends that the two agreements are distinct and independent of each other; that the option can in no sense be construed as his contract of employment; that, as heretofore stated, that contract was a verbal one, a part only of which, that relating to commissions, was put in writing; and that this contract of employment was without limitation as to time. This I submit to you as a question of fact. And if you find, from all the evidence, that the said agreements of May 5th were intended by the parties to cover the entire contract between them in relation to this property, and that the two papers were intended to constitute but a single agreement, then at the expiration of the option as extended the right of the plaintiff under the contract so existing would cease and determine. But if you should find as a fact that the agreements are distinct and independent of each other, and were so intended by the parties, that the contract of employment was a verbal one, and that the written memorandum of May 5th was a part only of the general contract of employment, upon which there was no time limit, then the contract with reference to the commissions would be binding upon the defendants, if the plaintiff performed his part of the agreement in the sale of the property."

The writings of April 26 and of May 5 spoke for themselves, and the trial judge should have construed them himself.

We need not discuss the parol evidence rule, and shall content ourselves with quoting several authoritative statements concerning its scope. In De Witt v. Berry, 134 U. S. 306, 10 Sup. Ct. 536, 33 L. Ed. 896, the Supreme Court said:

"The principle is that, while parol evidence is sometimes admissible to explain such terms in the contract as are doubtful, it is not admissible to contradict what is plain, or to add new terms."

In Seitz v. Brewers' Co., 141 U. S. 510, 12 Sup. Ct. 46, 35 L. Ed. 837, the same court referred to certain limitations of the rule:

"Undoubtedly the existence of a separate oral agreement as to any matter on which a written contract is silent, and which is not inconsistent with its terms, may be proven by parol, if under the circumstances of the particular case it may properly be inferred that the parties did not intend the written paper to be a complete and final statement of the whole of the transaction between them. But such an agreement must not only be collateral, but must relate to a subject distinct from that to which the written contract applies; that is, it must not be so closely connected with the principal transaction as to form part and parcel of it. And when the writing itself upon its face is couched in such terms as import a complete legal obligation, without any uncertainty as to the object or extent of the engagement, it is conclusively presumed that the whole engagement of the parties, and the extent and manner of their undertaking, were reduced to writing."

In Rucker v. Bolles (C. C. A. 8) 133 Fed. 858, 67 C. C. A. 30, Judge Van Devanter said:

"Where a written contract, entered into without fraud, accident, or mistake, purports upon its face to be a complete memorial of the whole agreement, the conclusive presumption is that the parties have written into the

contract every material item and term of their engagement, and it is not permissible to contradict, vary, or add to its terms by parol evidence."

In Godkin v. Monahan (C. C. A. 7) 83 Fed. 116, 27 C. C. A. 410, it is held that:

" * * * 'Whenever the contract purports on its face to be a memorial of the transaction, it supersedes all prior negotiations and agreements, and * * * oral testimony will not be admitted of prior or contemporaneous promises on a subject so clearly connected with the principal transaction with respect to which the parties are contending as to be part and parcel of the transaction itself, without the adjustment of which the parties cannot be considered as having finished their negotiations and finally concluded a contract.' We recognized the rule that parol evidence may be received of the existence of an independent oral agreement not inconsistent with the stipulations of the written contract in respect to which the writing does not speak, but not to vary, qualify, or contradict, add to, or subtract from, the absolute terms of the written contract."

If other authorities on the subject are desired, numerous citations will be found in 17 Cyc. 567 et seq., and in 10 Ruling Case Law, 1016 et seq.

In conclusion we may perhaps be permitted to add that an attentive study of this voluminous record has convinced us that a mind without bias can hardly be in serious doubt about the general course of events. Paisley conceived the idea of selling this property to the Grand Trunk interests, and of course expected to receive a satisfactory commission. The Coal Company was glad to have him try, and gave him two opportunities, limiting him as to time and other particulars. He failed, but did not abandon hope, and kept up his efforts, believing (not without reason) that he would receive another option whenever he could sufficiently persuade the railway. The parties owning the Coal Company were at least willing that he should continue his efforts, and may have encouraged him; but they made their own attempts to bring the sale about, and finally succeeded. Now, how far the Coal Company might have been liable to Paisley on a quantum meruit if the suit had claimed a reasonable compensation for such services as the company may have accepted and profited by, we do not undertake to say. But evidently this is a wholly different matter from the suit that was actually brought, which could not succeed without setting aside formal writings, and thus violating a well-tried rule that was never more valuable than it is to-day.

The judgment is reversed, and a new trial is awarded.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes